Berks County, Petitioner *v.* Commonwealth of Pennsylvania, Pennsylvania Labor Relations Board and American Federation of State, County and Municipal Employees, District Council 88, AFL-CIO, Respondents.

Argued March 2, 1982, before President Judge CRUMLISH and Judges ROGERS, BLATT, MACPHAIL and DOYLE.

*Alan S. Readinger,* First Assistant County Solicitor, for petitioner.

*James L. Crawford,* General Counsel, with him, *Anthony C. Busillo, II,* and *Theodore M. Lieverman, Kirschner, Walters & Willig,* for respondents.

*Alaine S. Williams,* for intervenors.

OPINION BY JUDGE ROGERS, May 27, 1982:

Berks County seeks review of a final order of the Pennsylvania Labor Relations Board (Board) dated March 4, 1980, dismissing exceptions to a Nisi Order dated November 30, 1979, and ordering the county to cease and desist from engaging in what the Board concluded was the unfair labor practice of refusing to bargain collectively and in good faith with the American Federation of State, County, and Municipal Employees, District Council 88 (union), the exclusive representative of the county's court-related employees, concerning terms and conditions of employment of the members during the year *1979.*

The cause was argued before this Court on March 2, 1982, and in response to a suggestion that matters concerning a collective bargaining agreement for 1979 might then be moot, the Court was advised by the Board that it considered the case to involve an important issue capable of repetition but also likely to avoid appellate review. The issue which the Board asserts should be decided in this case is that of whether the requirement of Section 801 of the Public Em-

ploye Relations Act[1] that an impasse in negotiations be submitted to mediation no later than 150 days prior to the public employer's budget submission date is mandatory, with the effect of relieving the public employer of any duty to negotiate with a union, when through no fault of either party, the provision cannot be complied with, or whether Section 801 is directory only so that the employer must negotiate, submit to mediation and, if necessary, go to arbitration whenever the union, otherwise appropriately, requests it. After a painstaking review of the facts and circumstances of this case, which we are about to record, we have concluded that this case does not presently present the issue desired to be resolved.

The facts adduced at a hearing conducted before a Board examiner on October 5, 1979, are, except as we shall indicate, undisputed. The union was certified for the purpose of collective bargaining by an order of the Board which became final on November 29, 1978.[2] On December 18, 1978 the union requested that the county engage in negotiations intended to produce a collective bargaining agreement for 1979. By letter dated December 20, 1978, the county solicitor responded to this request in pertinent part as follows:

---

[1] Act of July 23, 1970, P.L. 563, *as amended*, 43 P.S. §1101.801.

[2] The Board issued its first Nisi Order of Certification with respect to the union in February, 1976. After exceptions were filed to this order, however, this Court, on April 23, 1976, in *Barbieri v. Pennsylvania Labor Relations Board* (No. 610 C.D. 1976), and the Supreme Court, on March 10, 1977, in *Barbieri v. Pennsylvania Labor Relations Board* (No. 346 Miscellaneous Docket 21) enjoined the Board from proceeding in those matters involving "the judiciary, judicial districts or the judges thereof and their employees or asserted employees" pending the determination of the issues raised in *Ellenbogen v. County of Allegheny*, 479 Pa. 429, 388 A.2d 730 (1978) and its companion cases.

The commissioners are not unwilling to negotiate, but such negotiations must relate to the fiscal year 1980 since the budget has been fairly well fixed for the fiscal year 1979.

This position of the county was predicated on the fact that the submission date for its 1979 budget was December 5, 1978, two weeks before the union's request to commence negotiations, and on Sections 801 and 805 of the Public Employe Relations Act which provide respectively that an impasse in negotiations between public employers and their unionized employees be submitted to mediation ''in no event later than one hundred fifty days prior to the [employer's] 'budget submission date' '' and, if and after mediation fails, that the impasse shall be submitted to a panel of arbitrators. In sum, the county first said that it would not negotiate for 1979 because the request came thirteen days after its budget submission date for the year 1979, a date 163 days after the last date for mediation in case of a bargaining impasse.

The union took issue with the county's position and, on January 12, 1979, filed with the Board a charge that the county was engaged in an unfair labor practice.[3] At this point the recollections of the county's and the union's witnesses diverge. The union's chief negotiator, Arnold Mack, testified that in January, 1979, a Mr. Walter Powell was selected by the Board as hearing examiner with respect to the unfair practices charge and that Mr. Powell met with the county commissioners and with Mr. Mack and proposed that the union make no demand for an increase in wages in 1979 but that negotiations on all other proposed terms and conditions of employment should proceed.

---

[3] This charge was dismissed by action of the Board in August, 1979, after hearing examiner Powell informed the Board that the county and the union had returned to the bargaining table.

According to Mr. Mack this proposal was accepted by both sides.

On this point Donald W. Bagenstone, chairman of the Berks County Commissioners, testified that hearing examiner Powell advised the county and the union that in the light of the union's inability to comply with the timetable of Section 801, negotiations limited to "noneconomic" matters would satisfy the statutory obligation to bargain in good faith with regard to the 1979 fiscal year. Commissioner Bagenstone further testified that it was clearly understood and agreed by all those involved that a bargaining item was to be considered noneconomic and, therefore, a proper subject for negotiations only if it would involve no increased expenditure by the county. The primary goal of negotiation was agreed to be, as Mr. Bagenstone described it, merely the recordation in the form of a written contract of the existing terms and conditions of employment of the various classes of employees in the bargaining unit and then, if possible, the achievement of some consensus as to the particulars of provisions governing union dues deduction, measurement of seniority, and the procedure to be followed in the processing of contractual grievances.

Whatever the union and the county thought they agreed to before they went back to negotiations, it is clear that a common ground for negotiation was not in fact found because the bargaining sessions which then ensued, as both the union's and the county's witnesses described them, were disputatious and unproductive. The union pressed for concessions by the county on such items as a decrease in the number of hours required to be worked each week by members of the bargaining unit, an increase in personal leave days, childbirth leave, paid holidays and paid vacations, accrual of sick leave, the initiation of a parking

allowance, a clothing allowance, paid prescription drugs and vision care, and employer contributions to life and automobile liability insurance. In addition, the union continued to demand a direct increase in the rate of compensation paid to bargaining unit members in the form of a cost of living increment. This demand seems to have been in disregard of the union's conceded agreement not to press for an increase in wages for 1979.

As to all of the items enumerated above, the county consistently refused to bargain and, instead, submitted for consideration a proposed contract expressly maintaining the status quo as to these terms of employment and containing detailed provisions related, *inter alia,* to union recognition and security, dues deduction, working hours, rest and meal break periods, eating and sanitary facilities, holidays and vacations, unpaid leaves of absence for various purposes, scheduling of overtime work, and the procedure to be followed in the processing of contractual grievances. It is unclear whether any of these latter provisions were, in the form presented by the county, acceptable to the union. In addition, the goal of a number of negotiating sessions was, as the union's representative testified, the specification of the remuneration currently received by the various groups of employees of which the bargaining unit was constituted.

The last negotiating session was held sometime in June, 1979, and, by letter dated June 21, 1979, Arnold Mack, on behalf of the union, informed mediator Mark A. Lamont, whose services had been used during the negotiations, that:

Inasmuch as the County of Berks has repeatedly refused to negotiate with its court appointed employes concerning any "economic issues" for the fiscal year 1979, and has continued in

this posture which was initially outlined in a letter from C. Wilson Austin, Esquire, County Solicitor, to Mr. Arnold R. Mack . . . dated December 20, 1978 . . . we are hereby requesting that our contract proposals be submitted to arbitration. . . .

The county refused to make its selection from a panel of neutral arbitrators proffered by the Board.

The union then filed the unfair labor practices charge here at issue. In its Nisi Decision and Order the Board asserted that "[t]he sole issue before this Board is whether the Employer must submit to binding arbitration pursuant to Section 805 of [PERA] when the time limitations set forth in Section 801 of [PERA] have not been met." The Board resolved this issue by deciding that the Section 801 time limitations were merely directory and that, therefore, the county's refusal to participate in the selection of an arbitrator was unlawful. In its Final Order following the county's exceptions, the Board expressly rejected the county's prayer that, in any event, arbitration be limited to noneconomic items.

We are unpersuaded that the authorities relied on by the Board are sufficient to transmute to no more than a mere suggestion Section 801's requirement that "in no event" shall mediation be delayed beyond a date 150 days before the employer's budget submission date.[4] But more importantly, we are convinced that the Board's description of the issue it says needs deciding presents us with the impossible—that of hav-

---

[4] The Board chiefly relies on the decision of this Court in *United Transportation Union v. Southeastern Pennsylvania Transportation Authority (SEPTA)*, 22 Pa. Commonwealth Ct. 25, 347 A.2d 509 (1975) in which we held that the union was prohibited by Section 1002 of PERA, 43 P.S. §1101.1002, from engaging in a strike without first exhausting the procedures mandated by PERA Sec-

ing to decide a complex legal question in a case in which an unresolved issue of fact, when resolved, could leave us with nothing to decide.

In neither of the Board's decisions does it refer to, much less resolve, the only factual dispute made the subject of the October 5, 1979 hearing: the nature of the limitations placed by the parties on the scope of their negotiations at the instance of the Board's hearing examiner. Moreover, at no point does the Board give us the benefit of its analysis of the legal

tions 801 and 802, 43 P.S. §§1101.801 and 1101.802. While there is language in the opinion to the effect that it is the exhaustion of procedures that is critical in determining whether the decision to strike is lawful under Section 1002, that section of PERA is not at issue in this case and we believe that our statement in *SEPTA* of the applicable principle is as follows: "Two principles clearly emerge upon reading the aforementioned Sections 801 and 802 of [PERA]. First, it is clear that the collective bargaining process must be scheduled so that the public employer's proposed budget of expenditures can be adequately prepared in time for submission to the appropriate governing body for final action on the date for which such submission is required by law or practice (budget submission date)." (emphasis deleted) *Id.* at 31, 347 A.2d at 515 . The collective bargaining process was not so scheduled in the instant case where the union's first request for negotiations was made some two weeks after the county's budget submission date.

The Board also asserts that there are considerations of policy which distinguish the circumstances of these employees from that of those employees governed by the substantially identical negotiating timetable provisions contained in Act 111 related to the collective bargaining of policemen and firemen, 43 P.S. §§217.1 to 217.10; which provisions we have consistently held to be mandatory. Even if we were convinced that the considerations recited by the Board ought to have been reflected in the language of PERA Sections 802 and 805, the fact is that those sections are unambiguous, that they clearly prohibit the submission of an impasse in negotiations to arbitration later than one hundred thirty days prior to the budget submission date and, of course, we may not, when the words of a statute are clear and free from ambiguity, disregard the letter of the statute under the pretext of pursuing its spirit. 1 Pa. C. S. §1921(b).

effect of such agreed upon limitations. In the absence of such analysis we are simply unable to agree with the Board's implicit view that it is irrelevant whether hearing examiner Powell, as the county contends, instructed the negotiating parties to concern themselves only with establishing and recording the employment conditions existing prior to the approval of the county's 1979 budget and whether the parties so agreed. Surely, if the parties were so instructed and if they both agreed to conduct negotiations on that limited basis, it was not an unfair labor practice for the county to refuse to submit to binding arbitration contractual terms which the parties had agreed would not be the subject of negotiation or mediation. Hence, we must reverse the Board's Order and remand the matter to the Board for further proceedings, if either of the parties at this very late date still want to bargain concerning conditions to be effective as of 1979, including findings of fact concerning the scope of negotiations agreed to by the county and the union in consultation with hearing examiner Powell, and further order of the Board.

Accordingly we enter the following

ORDER

AND Now, this 27th day of May, 1982, the order of the Pennsylvania Labor Relations Board in the above captioned matter is reversed and the record is remanded for further proceedings consistent with this opinion.

Judge MENCER did not participate in the decision in this case.

———

CONCURRING AND DISSENTING OPINION BY JUDGE MacPHAIL:

I concur with that part of the order of the majority which reverses the order of the Pennsylvania Labor

Relations Board (Board), but I respectfully dissent from that part thereof which remands the case for further proceedings.

The language of Section 801 of the Public Employe Relations Act, Act of July 23, 1970, P.L. 563, *as amended*, 43 P.S. §1101.801 is clearly mandatory that an impasse in negotiations must be submitted to arbitration *"in no event* later than one hundred fifty days prior to the 'budget submission date' " (emphasis added). I believe this Court in *United Transportation Union v. Southeastern Pennsylvania Transportation Authority*, 22 Pa. Commonwealth Ct. 25, 347 A.2d 509 (1975) has already decided that the language is mandatory. *See* slip op. at 9, n. 4. Since the union in the instant case failed to meet the scheduling deadline, it is immaterial as to what the parties may have agreed would be proper subjects for negotiation.

As the majority opinion notes, we are dealing here with the year 1979 and the case, therefore, is moot. Our sole reason for hearing the case was to decide whether the language of Section 801 is mandatory (slip op. at 1). I fail to see how a remand will enable us to decide that issue; rather, I believe the issue can be resolved upon a proper interpretation of the statutory language.

I would, therefore, reverse the Board.